United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 19, 1998 Decided December 29, 1998 

 No. 97-5269

 James Campbell, 

 Appellant

 v.

 United States Department of Justice, 

 Appellee

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 89cv03016)

 James H. Lesar argued the cause and filed the briefs for 
appellant.

 Fred E. Haynes, Assistant U.S. Attorney, argued the cause 
for appellee. With him on the brief were Wilma A. Lewis, 
U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attor-
ney. Brian J. Sonfield, Assistant U.S. Attorney, entered an 
appearance.


 Before: Williams, Ginsburg and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Rogers.

 Rogers, Circuit Judge: James Campbell appeals from the 
grant of summary judgment to the Department of Justice in 
an action under the Freedom of Information Act ("FOIA") 
seeking Federal Bureau of Investigation ("FBI") records 
about author and civil rights activist James Baldwin. Camp-
bell contends that the FBI has conducted an inadequate 
search for documents responsive to his FOIA request, that 
the declarations in support of the FBI's invocation of FOIA's 
national security and law enforcement exemptions are insuffi-
ciently detailed to establish the absence of a genuine dispute 
of material fact, and that the district court erred in affirming 
the FBI's denial of Campbell's request for a complete waiver 
of fees. We agree with these contentions, in part because 
this circuit's FOIA jurisprudence has advanced while the 
lawsuit has stood relatively still, and we therefore reverse and 
remand the case to the district court for further proceedings.

 I.

 This case arises from a scholar's efforts to unearth artifacts 
from an awkward period in the history of the FBI. See, e.g., 
Hobson v. Wilson, 737 F.2d 1, 9-13 (D.C. Cir. 1984) (describ-
ing the FBI's COINTELPRO investigations). In 1988, Ap-
pellant James Campbell was writing a biography about James 
Baldwin, a noted author and leader in the civil rights move-
ment. To obtain information for use in his forthcoming book, 
Campbell submitted a FOIA request to the New York office 
of the FBI in which he sought "the FBI file" on Baldwin. 
The parties exchanged correspondence and the New York 
and national FBI offices identified and produced a limited 
number of responsive documents, often in redacted form. 
These documents, only some of which are in the appellate 
record, suggest that the FBI monitored Baldwin's civil rights 
activities and contacts with alleged communists during the 
1960s. The parties eventually reached an impasse about the 
scope of the FBI's disclosure obligations. After exhausting 

his administrative remedies, Campbell filed suit in November 
1989 for injunctive relief compelling the Justice Department 
to produce requested documents and waive copying fees. 
Over the course of the next year, the FBI released additional 
documents. In 1991, Campbell published "Talking at the 
Gates: A Life of James Baldwin."

 Between 1991 and 1996, Campbell's case languished in 
district court as various stays permitted the FBI to review 
documents and respond to new judicial interpretations of 
FOIA. In September 1996, the district court partially grant-
ed the Justice Department's motion for summary judgment. 
The court concluded that the FBI had conducted an adequate 
search, properly invoked exemptions to FOIA, and estab-
lished an appropriate copying fee. After conducting an in 
camera inspection of a file labeled "miscellaneous law en-
forcement," the court also concluded that the Department had 
properly invoked FOIA's law enforcement exemption, and in 
August 1997 granted summary judgment to the Department 
on that file as well. The court denied Campbell's cross 
motion for summary judgment, except with regard to a 
limited category of information related to certain investigative 
techniques that the court ordered be disclosed. Campbell 
appeals the September 1996 and August 1997 summary judg-
ment orders.

 II.

 A. Adequacy of the search. Viewing the FOIA terrain 
with an eye toward providing guidance to agencies consistent 
with congressional intent, the court explained with respect to 
an adequacy-of-search claim in Oglesby v. United States Dep't 
of the Army, 920 F.2d 57 (D.C. Cir. 1990), that "the agency 
must show that it made a good faith effort to conduct a search 
for the requested records, using methods which can be rea-
sonably expected to produce the information requested." Id. 
at 68. "If, however, the record leaves substantial doubt as to 
the sufficiency of the search, summary judgment for the 
agency is not proper." Truitt v. Department of State, 897 
F.2d 540, 542 (D.C. Cir. 1990). The court applies a "reason-


ableness" test to determine the "adequacy" of a search meth-
odology, Weisberg v. United States Dep't of Justice, 705 F.2d 
1344, 1351 (D.C. Cir. 1983), consistent with congressional 
intent tilting the scale in favor of disclosure. See, e.g., John 
Doe Agency v. John Doe Corp., 493 U.S. 146, 151-52 (1989).

 The record indicates that the FBI limited its search for 
information about James Baldwin to files that it could locate 
by searching its Central Records System (CRS) index, which 
is capable of locating most, but not all, documents responsive 
to a general request for information about a particular sub-
ject. The district court rejected Campbell's claim that the 
FBI had conducted an inadequate search because it failed to 
check a separate electronic surveillance (ELSUR) index and 
to search for "tickler"1 files even though documents that the 
FBI did produce alluded to potentially responsive ELSUR 
and tickler records.2 The FBI has not offered any evidence 
to rebut Campbell's claim that some of the Bureau's docu-
ments suggest--through administrative annotations and ex-
press references in the text3--that searching the ELSUR 
index, or searching for ticklers, would have identified addi-

__________
 1 A "tickler" is a duplicate file containing copies of documents, 
usually kept by a supervisor. Such files can be of interest to a 
FOIA requester because they could contain documents that failed to 
survive in other filing systems or that include unique annotations.

 2 Our review of the record indicates that Campbell properly 
raised this claim in the district court. We therefore reject the 
Department's waiver defense. See District of Columbia v. Air 
Florida, Inc., 750 F.2d 1077, 1084-85 (D.C. Cir. 1984).

 3 For example, document 147A on the Vaughn index bears a 
notation showing that it was routed to "Supervisor #42." Campbell 
has submitted unrebutted evidence that such a notation indicates 
the existence of a tickler file. Lesar Decl. p 3. Of course, to the 
extent that the FBI can demonstrate that this reference suggests 
the existence of only a particular type of tickler file, or one located 
in a particular place, it need not search for all tickler files that 
might be located anywhere; the scope of the FBI's search for 
ticklers need only be as broad as is reasonable in light of the 
evidence compelling such a search.

tional information about James Baldwin.4 Instead, the FBI 
contends that ELSUR and tickler searches are unnecessary 
in the vast majority of cases, and that it therefore need not 
conduct such searches unless expressly asked to do so in a 
FOIA request. Because Campbell's request asked only for 
"the FBI file" on Baldwin, the FBI maintains that it acted 
reasonably by searching only the CRS index.

 We will assume that the FBI's characterization of ELSUR 
and tickler searches is correct, and that such searches rarely 
uncover information beyond the scope of a CRS search. It 
follows from this assumption that in most cases, the FBI need 
not conduct ELSUR and tickler searches when the FOIA 
requester does not expressly ask it to do so. FOIA demands 
only a reasonable search tailored to the nature of a particular 
request. When a request does not specify the locations in 
which an agency should search, the agency has discretion to 
confine its inquiry to a central filing system if additional 
searches are unlikely to produce any marginal return; in 
other words, the agency generally need not "search every 
record system." Oglesby, 920 F.2d at 68.

 However, an agency "cannot limit its search to only one 
record system if there are others that are likely to turn up 
the information requested." Id. 
An agency has 
discretion to conduct a standard search in response to a 

__________
 4 The record suggests that the New York FBI office--as 
opposed to FBI Headquarters--did search its local ELSUR index. 
At oral argument, however, the Department was not able to confirm 
that such a search occurred. This factual ambiguity is not material 
on appeal because even if the New York office had searched its 
ELSUR index, the national office would still have been obliged to 
search its own index if it had cause to believe that such a search 
would identify responsive information. 

general request, but it must revise its assessment of what is 
"reasonable" in a particular case to account for leads that 
emerge during its inquiry. Consequently, the court evaluates 
the reasonableness of an agency's search based on what the 
agency knew at its conclusion rather than what the agency 
speculated at its inception. Here, the FBI started with the 
reasonable assumption that only a CRS review would be 
necessary, but that assumption became untenable once the 
FBI discovered information suggesting the existence of docu-
ments that it could not locate without expanding the scope of 
its search. Cf. Kowalczyk v. Department of Justice, 73 F.3d 
386, 389 (D.C. Cir. 1996). In resisting this conclusion, the 
Department maintains that the "weight of authority" justifies 
refusing to supplement a CRS search with an ELSUR search 
unless specifically asked to do so within the FOIA request. 
In fact, such authority indicates that the FBI must search 
ELSUR in addition to CRS in response to a general FOIA 
request for which ELSUR may be relevant. See Biberman v. 
FBI, 528 F.Supp. 1140, 1144-45 (S.D.N.Y. 1982); Larouche v. 
Webster, 1984 WL 1061, *2 (S.D.N.Y. 1984); cf. Schrecker v. 
United States Dep't of Justice, 14 F.Supp. 2d 111, 119 (D.D.C. 
1998). Moreover, the FBI appears in many cases to have 
searched ELSUR without being asked to do so. See Hart v. 
FBI, 1996 WL 403016 at *2 (7th Cir. 1996); Marks v. United 
States, 578 F.2d 261, 263 (9th Cir. 1978); Canning v. United 
States Dep't of Justice, 848 F. Supp. 1037, 1050 (D.D.C. 
1994).5

__________
 5 Other cases on which the Department relies do not support its 
argument. In Frydman v. Department of Justice, 852 F. Supp. 
1497 (D. Kan. 1994), aff'd mem., 57 F.3d 1080 (10th Cir. 1995), the 
district court criticized the FBI's failure to search ELSUR until 
specifically requested to do so, but held that the lapse was not "bad 
faith" within the context of the plaintiff's claim for attorney's fees. 
852 F. Supp. at 1505-06. This holding is hardly an endorsement of 
the Department's position. In Ferguson v. Kelly, 455 F. Supp. 324 
(N.D. Ill. 1978), the court denied plaintiff's motion for reconsidera-
tion of summary judgment in light of plaintiff's recent discovery of 
the existence of ELSUR. The odd procedural posture of Ferguson, 
coupled with its thin reasoning, render it an unpersuasive prece-


 The Department also asserts that the existence of ticklers 
in its archives is "speculative" because ticklers are not gener-
ally preserved for posterity and also might not contain infor-
mation distinct from what the FBI already found within the 
CRS. It is true that Campbell has claimed only that a tickler 
existed at one time, not that it exists today or that it contains 
unique information. Yet in any FOIA request, the existence 
of responsive documents is somewhat "speculative" until the 
agency has finished looking for them. As the relevance of 
some records may be more speculative than others, the 
proper inquiry is whether the requesting party has estab-
lished a sufficient predicate to justify searching for a particu-
lar type of record. Cf. Meeropol v. Meese, 790 F.2d 942, 953 
(D.C. Cir. 1986). Here, the FBI does not deny that such a 
predicate exists, rendering its "speculation" claim irrelevant. 
Cf. Oglesby v. United States Dep't of the Army, 79 F.3d 1172, 
1185 (D.C. Cir. 1996); Schrecker, 14 F. Supp. 2d at 119.

 For these reasons we conclude that the district court erred 
in finding that an adequate search had been made, and 
remand the case so that the FBI can be afforded an opportu-
nity to search for tickler and ELSUR records responsive to 
Campbell's FOIA request, and to proceed as the results of 
such searches require.6

__________
dent. Finally, the Department cites three cases for the general 
proposition that a CRS search is a sufficient response to a general 
FOIA request that does not identify specific locations to search. 
See Master v. FBI, 926 F. Supp. 193, 196 (D.D.C. 1996), aff'd mem., 
124 F.3d 1309 (D.C. Cir. 1997); Lawyers Comm. for Human Rights 
v. INS, 721 F.Supp. 552, 566-67 & n.12 (S.D.N.Y. 1989); Friedman 
v. FBI, 605 F. Supp. 306, 311 (N.D. Ga. 1981). None of these 
opinions indicates that the plaintiff had objected to the lack of an 
ELSUR search or that such a search might have been productive; 
indeed, none even mentions ELSUR.

 6 Campbell also challenges the adequacy of the FBI's search 
because it failed to locate two documents that the FBI provided to 
other FOIA requesters and one document that the FBI apparently 
lost. While any omission in a FOIA search is potentially troubling, 
the inadvertent omission of three documents does not render a 
search inadequate when the search produced hundreds of pages 

 B. Exemption 1 (National Security). FOIA authorizes 
an agency to withhold requested material if it is "properly 
classified" in the "interest of national defense or foreign 
policy" pursuant to an applicable executive order. 5 U.S.C. 
s 552(b)(1). In the instant case, the FBI invoked the nation-
al security exemption to redact documents and withhold at 
least two entire documents. The sole justification in the 
record for the FBI's classification decision is a nine-year old 
declaration from Special Agent Earl E. Pitts generally attest-
ing to the sensitivity of the withheld information and the 
general importance of safeguarding national security. On 
appeal, Campbell contends both that the district court failed 
to require the FBI to reevaluate its classifications under a 
new executive order and that the Pitts declaration is "too 
conclusory to support summary judgment." We find no error 
with regard to the executive order applied but agree that the 
district court erred in concluding that the Pitts declaration 
was sufficiently detailed to support withholding disclosure of 
certain materials.

 On the threshold issue of which executive order governs 
the FBI's national security determinations, the Department 
favors application of E.O. 12356 ("the Reagan Order"), which 
was in effect at the time that the FBI made the classification 
decisions at issue in this case, while Campbell proposes E.O. 
12958 ("the Clinton Order"), which took effect during the 
pendency of the district court proceedings. A district court 
may, upon request by an agency, permit the agency to apply 
a superceding executive order during the pendency of FOIA 
litigation. See Baez v. United States Dep't of Justice, 647 
F.2d 1328, 1334 (D.C. Cir. 1980). However, absent a request 
by the agency to reevaluate an exemption 1 determination 
based on a new executive order, the district court may not 
require the agency to apply the new order; instead, the court 
must evaluate the agency's decision under the executive order 
in force at the time the classification was made. See King v. 
United States Dep't of Justice, 830 F.2d 210, 216-17 (D.C. 
Cir. 1987); Lesar v. United States Dep't of Justice, 636 F.2d 

__________
that had been buried in archives for decades. See Meeropol, 790 
F.2d at 952-53.


472, 480 (D.C. Cir. 1980). This rule prevents undue delay and 
burden in the resolution of FOIA claims by introducing an 
element of finality into agency decisionmaking. See Lesar, 
636 F.2d at 480. It follows that the district court properly 
applied the Reagan Order because the FBI did not seek leave 
to reconsider its position in light of the Clinton Order.

 However, Lesar did not purport to create a general rule 
about the non-applicability of superceding executive orders in 
ongoing FOIA cases. Rather, the opinion relied in part on an 
interpretation of the superceding executive order, which the 
court found to be expressly prospective because it preserved 
all classification decisions made under prior orders. See id. 
The mere fact that the Clinton Order came into force after 
the classification decisions in the instant case therefore does 
not in and of itself preclude application of the Order under 
Lesar. Instead, the question is whether the Clinton Order 
calls prior classification decisions under the Reagan Order 
into question.7 We conclude that the Clinton Order does not 
permit FOIA litigants to reopen classification decisions final-
ized before the Order's effective date. As with the order 
reviewed in Lesar, the Clinton Order defines classified infor-
mation to include information classified under prior orders. 
See E.O. 12958 s 1.1(c). Moreover, the Clinton Order does 
not contain any provision that requires an agency to reconsid-
er classification decisions in pending FOIA litigation.

 Campbell nevertheless contends that the Clinton Order is 
"remedial" and therefore requires a remand. Executive or-
ders that replace a prior order are likely to be remedial in 
that they correct some perceived deficiency in the prior 
regime. Thus, the relevant question is not whether the new 
order materially differs from the old, but rather whether the 
new order confines its disagreement with the past to reme-

__________
 7 This reasoning is consistent with King, which has language in 
it that appears to characterize Lesar as creating a per se rule 
applicable to all future transitions between executive orders. See 
830 F.2d at 217. A careful reading of King reveals, however, that 
the court expressly recognized that Lesar relied on a "carry-over 
provision" in the superceding executive order that preserved classi-
fication decisions made under the prior order. Id. at 216.

dies that operate in the future, or instead creates a retrospec-
tive remedy that allows a FOIA litigant to reopen an other-
wise final review. While, as Campbell observes, the Clinton 
Order substantially alters the process for declassifying rela-
tively old documents, see, e.g., E.O. 12958 ss 3.3(e) & 3.6, 
nothing in the Order requires the district court to apply the 
new standards in a pending FOIA action.

 Turning to the merits of Campbell's challenge to the FBI's 
decisions under exemption 1, we note that the Department's 
sole explanation and defense of the FBI's exemption 1 classi-
fications is the Pitts declaration and accompanying appendi-
ces.8 An agency bears the burden to justify exemptions 
under FOIA. See PHE, Inc. v. Department of Justice, 983 
F.2d 248, 250 (D.C. Cir. 1993). One way to discharge this 
burden is to submit a declaration from an appropriately 
qualified official attesting to the basis for the agency's deci-
sion. In the context of national security exemptions, such 
declarations merit "substantial weight." King, 830 F.2d at 
217; Military Audit Project v. Casey, 656 F.2d 724, 737 (D.C. 
Cir. 1981). However, deference is not equivalent to acquies-
cence; the declaration may justify summary judgment only if 
it is sufficient "to afford the FOIA requester a meaningful 
opportunity to contest, and the district court an adequate 
foundation to review, the soundness of the withholding." 
King, 830 F.2d at 218. Among the reasons that a declaration 
might be insufficient are lack of detail and specificity, bad 
faith, and failure to account for contrary record evidence. 
See id. Here, only detail and specificity are at issue.

 To justify summary judgment, a declaration must provide 
detailed and specific information demonstrating "that materi-

__________
 8 The appendices consist of redacted documents marked with a 
coded annotation and a catalog explaining the meaning of each code. 
Campbell suggests that this system of marking documents is inher-
ently flawed. However, the court has previously stated that this 
methodology for explaining classification decisions can be sufficient 
provided that it complies with the substantive requirements noted 
above, which are applicable to any methodology for processing 
FOIA exemptions. See Keys v. United States Dep't of Justice, 830 
F.2d 337, 349-50 (D.C. Cir. 1987).

al withheld is logically within the domain of the exemption 
claimed." King, 830 F.2d at 217. "[A]n affidavit that con-
tains merely a 'categorical description of redacted material 
coupled with categorical indication of anticipated conse-
quences of disclosure is clearly inadequate.' " PHE, 983 F.2d 
at 250 (quoting King, 830 F.2d at 224). Or as the court 
stated in Hayden v. National Sec. Agency, 608 F.2d 1381, 
1387 (D.C. Cir. 1979), "the affidavits must show, with reason-
able specificity, why the documents fall within the exemption. 
The affidavits will not suffice if the agency's claims are 
conclusory, merely reciting statutory standards, or if they are 
too vague or sweeping." Id. (footnote omitted). These re-
quirements are consistent with the agency's general obli-
gation to create "as full a public record as possible, concern-
ing the nature of the documents and the justification for 
nondisclosure." Id. at 1384.

 The Pitts declaration cannot satisfy the foregoing stan-
dards. Notably, the Pitts declaration does not contain any 
specific reference to Baldwin or any other language suggest-
ing that the FBI tailored its response to a specific set of 
documents. Cf. Wiener v. FBI, 943 F.2d 972, 979 (9th Cir. 
1991). More importantly, the declaration fails to draw any 
connection between the documents at issue and the general 
standards that govern the national security exemption. For 
example, the declaration states that "[a]ll of the intelligence 
activities or methods detailed in the withheld information are 
currently utilized by the FBI" and that disclosure of intelli-
gence methods is undesirable. However, the declaration 
makes no effort to assess how detailed a description of these 
Hoover-era methods the documents provide, and whether 
disclosure would be damaging in light of the degree of detail. 
Similar failures to connect general statements about the 
content of the withheld documents with general standards for 
classifying information appear elsewhere in the declaration.

 The Department's explanation for the declaration's lack of 
detail is that providing more detail would "risk[ ] the disclo-
sure of the very information that the FBI was attempting to 
protect." The court has acknowledged that requiring too 
much detail in a declaration could defeat the point of the 


exemption, but concluded nonetheless that in most cases the 
agency should not have difficulty describing the context and 
nature of the withheld information without revealing its sub-
stance. See Hayden, 608 F.2d at 1385. Only in special 
circumstances, such as those surrounding the intelligence 
mission of the National Security Agency, can even minimal 
detail itself constitute sensitive information. See id.9 Here 
the information appears to describe no more than routine 
FBI surveillance and monitoring techniques. Such activity 
no doubt generates material that may properly be classified 
and withheld under FOIA, but it is implausible to baldly 
assert that such material is so sensitive that the FBI is 
incapable of providing any descriptive information. Likewise, 
summary judgment was inappropriate with respect to two 
documents, comprising six pages, that the FBI withheld 
without providing any details (including date) in the Pitts 
declaration10 or elsewhere because a conclusory assertion that 
material is exempt and nonsegrable is insufficient to support 
nondisclosure. See, e.g., Kimberlin v. Department of Justice, 
139 F.3d 944, 950 (D.C. Cir. 1998).

 On remand, the district court can either review the docu-
ments in camera or require the FBI to provide a new 
declaration. See PHE, 983 F.2d at 253. The latter course is 
favored where agency affidavits are facially inadequate; oth-
erwise the district court is effectively left to speculate about 
why an agency may be able to classify a document and cannot 

__________
 9 In such circumstances, "the solution is for the court to review 
the document in camera" rather than passively accept an agency's 
unsubstantiated exemption 1 defense. Simon v. Department of 
Justice, 980 F.2d 782, 784 (D.C. Cir. 1992).

 10 The Department's brief cites paragraphs 22 and 23 of the 
Pitts declaration to support withholding these two documents, but 
the cited paragraphs are boilerplate that make no reference to the 
disputed material. Indeed, paragraphs 22 and 23 apply solely to 
material that was redacted rather than entirely withheld because 
they invite the reader to review unredacted portions of documents 
to discern the "context" for the deletions. Such review is of course 
impossible here.

review a concrete classification decision.11 See id. A new 
declaration need not exhaustively explain each redaction and 
withholding, but it must provide sufficient information to 
permit Campbell and the district court to understand the 
foundation for and necessity of the FBI's classification deci-
sions. See King, 830 F.2d at 218.

 C. Exemption 7 (Law Enforcement). FOIA exempts 
from disclosure six categories of documents that have been 
"compiled for law enforcement purposes." 5 U.S.C. 
s 552(b)(7)(A)-(F). The FBI withheld information based on 
various sub-categories of this law enforcement exemption. 
The district court concluded that the withheld information 
was compiled for a law enforcement purpose and fit within 
one of the subcategories within exemption 7. With respect to 
all but one set of documents, the district court relied on the 
FBI's declarations. However, the district court did not find 
the declarations adequate to justify withholding a file labeled 
"miscellaneous law enforcement" and instead conducted an in 
camera review, thereafter concluding that most of the file had 
been properly withheld, but ordering a small supplemental 
disclosure to Campbell.12

 On appeal, Campbell contends first, that the FBI's declara-
tions were insufficient to establish a rational nexus between 

__________
 11 In preparing a new declaration on remand, the FBI's new 
declarant (assuming that Mr. Pitts is no longer available) presum-
ably must re-review the redactions and withholdings. The Clinton 
Order will govern this review. See King, 830 F.2d at 216; Afshar v. 
Department of State, 702 F.2d 1125, 1137 (D.C. Cir. 1983). This 
rule is consistent with our reasoning in Lesar: when an agency has 
completed a FOIA review, principles of finality weigh against 
ordering a new review under a new order, but when a court orders 
a new review on other grounds, respect for the President's authori-
ty to define national security priorities requires that the new review 
proceed under current law rather than the superceded law of a 
prior administration. See King, 830 F.2d at 217.

 12 Although Campbell has also appealed from the district 
court's August 1997 order, his brief does not address the materials 


the withheld material and a legitimate law enforcement pur-
pose, and second, that information was improperly withheld 
under exemptions 7(C) (invasion of personal privacy) and 7(D) 
(disclosure of confidential sources). We agree with Camp-
bell's first contention and therefore remand to the district 
court for further development of the record. With that 
remand in mind, and in the hope of bringing resolution to this 
1988 FOIA request, we comment briefly on Campbell's 7(C) 
and 7(D) contentions.

 Because the FBI specializes in law enforcement, its deci-
sion to invoke exemption 7 is entitled to deference. See Pratt 
v. Webster, 673 F.2d 408, 419 (D.C. Cir. 1982). This court's 
"deferential" standard of review is not, however, "vacuous." 
Id. at 421. If the FBI relies on declarations to identify a law 
enforcement purpose underlying withheld documents, such 
declarations must establish a rational "nexus between the 
investigation and one of the agency's law enforcement duties," 
id. at 421, and a connection between an "individual or incident 
and a possible security risk or violation of federal law." Id. 
at 420. If the declarations "fail to supply facts" in sufficient 
detail to apply the Pratt rational nexus test, then a court may 
not grant summary judgment for the agency. Quinon v. 
FBI, 86 F.3d 1222, 1229 (D.C. Cir. 1996); see also Davin v. 
United States Dep't of Justice, 60 F.3d 1043, 1056 (3d Cir. 
1995).

 The Department has identified only two facts to establish 
that documents relating to James Baldwin were compiled for 
a law enforcement purpose. First, the FBI relies on a 
declaration from Special Agent Regina Superneau in which 
she lists the names of the files containing withheld informa-
tion. The relevant labels are: "Interstate Transportation of 
Obscene Material," "Security Matter--Communism," and "In-
ternal Security."13 The fact that information is stored inside 

__________
that the district court reviewed in camera. We therefore affirm the 
district court's order with respect to those exemption 7 materials.

 13 The Department's brief does not reference a file labeled 
"Racial Matter" despite the fact that the declaration indicates that 

a folder with an official-sounding label is insufficient standing 
alone to uphold nondisclosure. See, e.g., Simon, 980 F.2d at 
784; Keys, 830 F.2d at 341. Indeed, the Department's posi-
tion reduces to the long-rejected claim that anything in an 
FBI file pertains to an exempt law enforcement purpose. See 
Pratt, 673 F.2d at 415. At a minimum, the FBI must 
demonstrate the relationship between a record and its label 
and between the label and a law enforcement purpose.

 Second, the Department relies on a statement in the decla-
ration of Special Agent Debra Mack that "[t]he FBI investi-
gation of James Baldwin was predicated upon the fact that 
established security sources of the FBI had indicated that 
James Baldwin was associating with persons and organiza-
tions which were believed to be a threat to the security of the 
United States." If this statement were offered to justify 
exemption of a particular document, it might suffice provided 
it contained sufficient detail about the scope of the association 
and the nature of the threat. The problem, however, is that 
the Department relies on this statement to justify every 
withholding from each of at least three files collected over 
many years on different topics in different contexts. The 
FBI appears to maintain that once it can justify its investiga-
tion of a person, all documents related to that person are 
exempt from FOIA, even if the documents were collected for 
a different reason. This position is untenable. Rather, to 
justify summary judgment under exemption 7, the FBI must 
explain why each withheld document or set of closely similar 
documents relate to a particular law enforcement purpose. 
The Mack declaration does not attempt this inquiry. Thus, 
although the FBI may possess some documents related to a 
valid law enforcement investigation of James Baldwin, we 
cannot conclude that each withheld document about James 
Baldwin related to such an investigation. Absent a sufficient 
threshold showing that the withheld information was "com-

__________
this was a law enforcement file. On remand, the district court 
should determine whether information was withheld from this file 
and whether it is related to a legitimate law enforcement purpose.


piled for law enforcement purposes," we reverse; on remand 
the FBI may again attempt to meet its statutory burden. 
See Summers v. Department of Justice, 140 F.3d 1077, 1083 
(D.C. Cir. 1998).

 Exemption 7(C) bars disclosures that "could reasonably be 
expected to constitute an unwarranted invasion of personal 
privacy." 5 U.S.C. s 552(b)(7)(C). An agency may not with-
hold records under exemption 7(C) solely because disclosure 
would infringe legitimate privacy interests, but must balance 
privacy interests against the public's interest in learning 
about the operations of its government. See United States 
Dep't of Defense v. Federal Labor Relations Auth., 510 U.S. 
487, 495 (1994); United States Dep't of Justice v. Reporters 
Comm. for Freedom of the Press, 489 U.S. 749, 762 (1989). 
The record suggests that the FBI made an abstract attempt 
to identify possible public interests in disclosure and accorded 
these interests surprisingly little weight. This attitude is 
troubling given the presumption of openness inherent in 
FOIA, see Department of Air Force v. Rose, 425 U.S. 352, 361 
(1976), and the obvious historical value of documents describ-
ing the FBI's role in the cold war and in the civil rights 
movement. Undoubtedly there are important privacy rights 
of individuals caught in the web of a wide-ranging criminal 
investigation that warrant protection, but the balancing pro-
cess in the instant case appears to have been somewhat of an 
empty formality. On remand, the FBI will have the opportu-
nity to provide additional explanation about the relative 
weight of the competing public and private interests at stake, 
and the district court will have an opportunity to provide an 
analysis that will "fully articulate the balance it reaches" and 
resolve "fact-intensive" issues to permit "efficient and mean-
ingful" appellate review. Summers, 140 F.3d at 1083.

 Insofar as Campbell contends that the FBI has wrongfully 
invoked exemption 7(C) to protect the privacy of people who 
are dead, two questions are presented: how does death affect 
the exemption 7(C) balancing calculus, and what must the 
FBI do to ascertain whether the persons whose privacy it 
seeks to protect have died. First, death clearly matters, as 
the deceased by definition cannot personally suffer the 


privacy-related injuries that may plague the living. A court 
balancing public interests in disclosure against privacy inter-
ests must therefore make a reasonable effort to account for 
the death of a person on whose behalf the FBI invokes 
exemption 7(C). See Summers, 140 F.3d at 1084-85 (Silber-
man, J., concurring); id. at 1085 (Williams, J., concurring); 
Kiraly v. Federal Bureau of Investigation, 728 F.2d 273, 277-
78 (6th Cir. 1984).14 The court must also account for the fact 
that certain reputational interests and family-related privacy 
expectations survive death. As was recently pointed out by 
the Supreme Court in Swidler & Berlin v. United States, 118 
S. Ct. 2081, 2086 (1998), the attorney-client privilege survives 
the death of the client, who "may be concerned about reputa-
tion, civil liability, or possible harm to friends or family." 
This instruction by the Court would appear to undercut the 
conclusion of the Third Circuit in Davin, 60 F.3d at 1058, and 
McDonnell v. United States, 4 F.3d 1227, 1257 (3d Cir. 1993), 
that under FOIA deceased persons "have no privacy interest 
in nondisclosure of their identities." The scope and weight of 
these interests need not be resolved on the present record, 
however, although we note analysis of privacy under FOIA 
often differs from similar analysis in other areas of the law. 
See Reporters Committee, 489 U.S. at 762 n.13.

 Second, the present record is insufficient to permit mean-
ingful discussion of the extent, if any, to which the FBI must 
investigate to determine whether putative beneficiaries of 
7(C) are alive or dead. See Summers, 140 F.3d at 1085 
(Williams, J., concurring). On remand, the parties may docu-
ment their respective positions, and the district court should 
order the FBI to take such action as is necessary to ensure 
proper implementation of exemption 7(C). To the extent 
Campbell has also challenged specific redactions of names or 
categories of names, the district court, which will have the 
benefit of the FBI's supplemental declarations, can initially 
resolve these challenges more effectively.

__________
 14 Death of a confidential source, in contrast, is not relevant 
under exemption 7(D). See Schmerler v. FBI, 900 F.2d 333, 335-36 
(D.C. Cir. 1990).


 Exemption 7(D) covers "records or information compiled by 
criminal law enforcement authorities in the course of criminal 
investigations if their release could reasonably be expected to 
disclose the identity of, as well as information provided by, a 
confidential source." Computer Prof'ls for Social Responsi-
bility v. United States Secret Serv., 72 F.3d 897, 905 (D.C. 
Cir. 1996). The mere fact that a person or institution pro-
vides information to a law enforcement agency does not 
render that person a "confidential source" within the meaning 
of exemption 7(D). See United States Dep't of Justice v. 
Landano, 508 U.S. 165, 178 (1993). Rather, exemption 7(D) 
applies only when "the particular source spoke with an under-
standing that the communication would remain confidential." 
Id. at 172. Such understandings are reasonable when the law 
enforcement agency receiving information provides either an 
express or implied assurance of confidentiality. See id.

 The district court concluded that the FBI appropriately 
withheld information received from sources to whom the FBI 
had provided either express or implied assurances of confi-
dentiality. The district court's reasoning with respect to the 
implied assurances is correct,15 but the FBI's declarations 
with respect to express assurances are insufficient to warrant 
summary judgment.

 To withhold information under Exemption 7(D) by express 
assurances of confidentiality, the FBI must present "proba-
tive evidence that the source did in fact receive an express 
grant of confidentiality." Davin, 60 F.3d at 1061. Such 
evidence can take a wide variety of forms, including notations 
on the face of a withheld document, the personal knowledge 

__________
 15 The district court concluded that local, state, and foreign law 
enforcement agencies, as well as a former member of an allegedly 
subversive organization, had cooperated with the FBI's anti-
communist activities based upon an implied assurance of confiden-
tiality. This conclusion is consistent with the record and with the 
Supreme Court's analysis in Landano. See Landano, 508 U.S. at 
175-76; Ferguson v. FBI, 83 F.3d 41, 43 (2d Cir.1996); Declaration 
of Debra Mack at pp 19-34.


of an official familiar with the source, a statement by the 
source, or contemporaneous documents discussing practices 
or policies for dealing with the source or similarly situated 
sources. See, e.g., id.; Computer Prof'ls, 72 F.3d at 906. No 
matter which method the agency adopts to meet its burden of 
proof, its declarations must permit meaningful judicial review 
by providing a sufficiently detailed explanation of the basis 
for the agency's conclusion. For, as the Supreme Court has 
observed in regard to mere assertions that there is a confi-
dential source: "Once the FBI asserts that information was 
provided by a confidential source ... the requester--who has 
no knowledge about the particular source or the information 
being withheld--very rarely will be in a position to offer 
persuasive evidence that the source in fact had no interest in 
confidentiality." Landano, 508 U.S. at 177.

 The FBI declaration simply asserts that various sources 
received express assurances of confidentiality without provid-
ing any basis for the declarant's knowledge of this alleged 
fact. Given that the declarant presumably lacks personal 
knowledge of the particular events that occurred more than 
30 years ago, more information is needed before the court can 
conclude that exemption 7(D) applies. We also note that 
while the FBI's declaration maintains that many documents 
reveal express guarantees of confidentiality on their face, 
some of these guarantees have been redacted or the entire 
document withheld, rendering judicial review impossible. On 
remand, the FBI can produce such additional information as 
is necessary to document its exemption 7(D) defenses.

 III.

 Finally, Campbell challenges the fee assessment for copy-
ing certain FBI files. FOIA permits an agency to charge a 
reasonable fee for searching, copying, and reviewing files. 
See 5 U.S.C. s 552(a)(4)(A)(ii). The agency must waive or 
reduce this fee when disclosure of requested information is 


"in the public interest because it is likely to contribute 
significantly to public understanding of the operations or 
activities of the government and is not primarily in the 
commercial interest of the requester." 5 U.S.C. 
s 552(a)(4)(A)(iii). The FBI has promulgated regulations to 
structure its discretion under this fee waiver provision. See 
28 C.F.R. s 16.11(d). Judicial review in "any action by a 
requester regarding the waiver of fees" is de novo, but is 
limited to the record before the agency. 5 U.S.C. 
s 552(a)(4)(A)(vii).

 The FBI did not charge Campbell any fees for search and 
review related to his FOIA request, but it did charge for 
approximately $165 in copying expenses. Campbell did not 
pay the full amount because the FBI granted him a 60% fee 
waiver. According to the FBI, the remaining 40% of the fees 
were not waivable because 40% of the released documents 
would not further public understanding about the operations 
of government. Such documents were either redundant with 
material already in the public domain, repetitious with other 
material being produced, or contained administrative informa-
tion of no importance to the public. If a page contained any 
substantive information, even if embedded within mostly non-
substantive material, the FBI granted a waiver.

 The district court accepted the FBI's reasoning and af-
firmed the 60% waiver, noting that:

 Neither party disputes that FBI and CIA files of civil 
 rights activist James Baldwin concern the 'operations or 
 activities of the government.' Nor is it disputed that 
 plaintiff stands to gain commercially from responsive 
 documents. Indeed, plaintiff has already authored a 
 biography about James Baldwin using materials respon-
 sive to his FOIA request. The court concurs with the 
 FBI's assertion that 40% of the releasable material was 
 not new material. As such, the court is persuaded that 
 the material would therefore be less likely to contribute 
 significantly to public understanding. Accordingly, the 
 court upholds the FBI decision to grant a 60 percent 


 partial fee waiver and charge duplication fees for the 
 remaining 40 percent.

Memorandum Opinion at 18-19. Campbell challenges this 
reasoning and contends that he is entitled to a 100% fee 
waiver. We agree that the district court must reconsider its 
analysis, but we decline to hold that the FBI cannot charge 
Campbell any copying fees.

 The district court prominently noted its view that the 
parties agreed "that plaintiff stands to gain commercially 
from responsive documents." Yet this statement is contra-
dicted by the record, as the FBI did not take commercial 
profit into account when calculating a fee waiver because it 
concluded that Campbell "has no overriding commercial inter-
est in this case." The FBI's reasoning is consistent with the 
underlying purpose of the fee waiver provisions, which afford 
"special solicitude" to scholars whose archival research ad-
vances public understanding of government operations. Na-
tional Treasury Employees Union v. Griffin, 811 F.2d 644, 
649 (D.C. Cir. 1987). The fact that a bona fide scholar profits 
from his scholarly endeavors is insufficient to render his 
actions "primarily ... commercial" for purposes of calculating 
a fee waiver, as Congress did not intend for scholars (or 
journalists and public interest groups) to forego compensation 
when acting within the scope of their professional roles. The 
quasi-commercial nature of Campbell's research was there-
fore irrelevant for purposes of calculating an appropriate fee 
waiver.

 The district court also agreed with the FBI "that 40% of 
the releasable material was not new material.... [and] 
would therefore be less likely to contribute significantly to 
public understanding." Our review of the FBI's fee waiver 
decision indicates that the FBI reached this conclusion based 
on several flawed assumptions. For example, the FBI con-
cluded that previously unreleased summaries by its staff of 
newspaper articles constitute public domain material, because 
the underlying articles are public, that would not further 
public understanding. Yet the fact that FBI work-product 
incorporates publicly available information does not detract 


from its value independent of the source material. Indeed, 
insight into how the FBI reacts to the media is the kind of 
public understanding of government operations that FOIA 
was designed to foster.

 The district court also accepted the FBI's contention that 
portions of the requested materials were already in the public 
domain. Yet the FBI has never explained where in the 
"public domain" these materials reside. Such an explanation 
is necessary because the mere fact that material is in the 
public domain does not justify denying a fee waiver; only 
material that has met a threshold level of public dissemina-
tion will not further "public understanding" within the mean-
ing of the fee waiver provisions. See, e.g., Carney v. United 
States Dep't of Justice, 19 F.3d 807, 815-16 (2d Cir. 1994); 
Schrecker v. Department of Justice, 970 F. Supp. 49, 50-51 
(D.D.C. 1997); Fitzgibbon v. Agency for Int'l Dev., 724 
F. Supp. 1048, 1051 (D.D.C. 1989). Likewise, the FBI has 
not indicated how closely related the requested material was 
to material already in the public domain, an omission that 
precludes deference to its ultimate conclusions.

 Furthermore, the presence of administrative material with-
in files that also contain substantive documents does not 
justify charging fees for copying the non-substantive clutter. 
The fee waiver provisions implicitly assume that valuable 
government information tends not to be freestanding; few 
files contain neatly segregated "substantive" documents shorn 
from their administrative accompaniments. Congress pre-
sumably did not intend agencies to pick through responsive 
records to determine the percentage of the record that con-
tains interesting morsels and to deem the remainder of the 
record irrelevant to public understanding. The more plausi-
ble reading of the statute is that once a given record is 
deemed to contain information warranting a waiver, all of the 
related pages within that record that are responsive to the 
FOIA request fall under the waiver even if each individual 
page would not independently qualify.16 It would then fall to 

__________
 16 A different standard might apply to records or files that are 
uncommonly large or that contain only a few substantive documents 
relative to the volume of administrative information.

the requester--here a scholar--rather than the FBI, to parse 
the wheat from the chaff. Cf. Project on Military Procure-
ment v. Department of the Navy, 710 F. Supp. 362, 366 
(D.D.C. 1989).

 In addition, the FBI impermissibly denied a waiver for 
copying repetitious, but non-duplicative, material. A scholar 
has a strong interest in reviewing each repetition of a given 
topic within a file or set of files to explore nuances and assess 
the manner in which the government handled the information. 
Deeming repetitious documents within a single request to be 
of no value to "public understanding" is therefore inconsistent 
with the purposes of FOIA.17 Of course, repetition at some 
point shades into duplication, but the record on appeal does 
not explain how the FBI distinguished between permissible 
and impermissible repetition; we learn only that the Bureau 
denied a waiver for documents with "substantially the same 
information" as other documents.

 Accordingly, we reverse the grant of summary judgment 
and remand the case to the district court so that the FBI can 
conduct an adequate search for ELSUR and tickler records, 
justify its defenses under exemptions 1, 7(C), and 7(D) in 
sufficient detail to permit meaningful judicial review, and 
recalculate its fee waiver ratio to comply with the statutory 
standards.18

__________
 17 The FBI also denied a waiver for copying duplicate docu-
ments. This decision appears legitimate, although in certain cir-
cumstances the fact that a given document was found in a given file 
could further public understanding even if the contents of the 
document are already known.

 18 In light of this disposition, the district court's discussion of 
attorney's fees is premature; Campbell remains free to request 
such fees at a later stage in the litigation.