**Anthony SUMMERS, Appellant,**

v.

**DEPARTMENT OF JUSTICE, Appellee.**

No. 97–5002.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 8, 1998.

Decided April 17, 1998.

Daniel S. Alcorn argued the cause for appellant. James H. Lesar, Washington, DC, was on the briefs.

Melanie A. Pustay, Senior Counsel, United States Department of Justice, Washington, DC, argued the cause for appellee, with whom Mary Lou Leary, United States Attorney at the time the brief was filed, and R. Craig Lawrence, Assistant United States Attorney, were on the brief.

Before: SILBERMAN, WILLIAMS and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Circuit Judge SILBERMAN.

Concurring opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

SENTELLE, Circuit Judge:

In this case arising under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1997), author Anthony Summers seeks to compel release of the official and confidential records of former FBI Director J. Edgar Hoover. Summers and the government filed cross-motions for summary judgment on the issue of Summers's entitlement to disputed documents. The district court granted the motion of the government and denied that of the plaintiff in a summary order without explanation. Although we review grants of summary judgment *de novo*, and the law does not require district judges to enter findings of fact or conclusions of law in the grant of such motions, because of the unique nature of FOIA litigation our precedents under that statute permit remand for the development of an adequate explanation when we find an abuse of discretion in the failure of the district court to provide one. As this is such a case, we remand for further proceedings.

## I. Background

J. Edgar Hoover maintained an extensive array of FBI files in his office at FBI Headquarters. These documents—the so-called "official and confidential" files—include FBI files that Hoover had charged out of the FBI's central records system; Hoover's official and personal correspondence; as well as various FBI memoranda. In December of 1986, Anthony Summers, appellant here, filed a FOIA request with the FBI seeking release of Hoover's official and confidential files.

In response to Summers's FOIA request, the FBI first released approximately 6,500 pages of material that had previously been made public under an earlier FOIA request. In addition, the FBI reprocessed the official and confidential files, ultimately releasing about 12,000 additional pages to Summers. In doing so, the FBI withheld portions of these files pursuant to exemptions 1, 2, 6, 7(C), 7(D), and 7(E) of the FOIA. *See* 5 U.S.C. § 552(b).

Challenging the FBI's claimed exemptions, Summers filed a lawsuit against the United States Department of Justice in November 1987. By agreement of the parties, Summers selected 500 pages of the official and confidential files to serve as the basis for the FBI's *Vaughn* index, setting forth its justifications for refusing disclosure. The parties subsequently filed cross-motions for summary judgment addressing the FBI's withholding of certain documents and portions of documents. In support of its motion, the government submitted eight affidavits prepared by FBI Special Agents. These affidavits purported to explain the nature of the withheld information, and stated which FOIA exemption or exemptions were intended to justify the withholding.

After the cross-motions for summary judgment became ripe for decision, the district court scheduled a status-call/motions hearing for November 1, 1996. A transcript of the hearing, which lasted approximately three minutes, appears below:

> THE DEPUTY CLERK: Civil Action 87–3168, Anthony Summers v. Department of Justice. Mr. Lesar for the plaintiff, Melanie Pustay for the defendant.
>
> MR. LESAR: Good morning, Your Honor.
>
> THE COURT: Good morning, ladies and gentlemen. I have come to the conclusion in reviewing this case that it is a dead stalemate at the moment, that there are going to be no more documents released, there's going to be no settlement, and that there is really no alternative left to simply deciding the motions. I take it you concur?
>
> MR. LESAR: I certainly concur, yes.
>
> THE COURT: Well, we have reviewed the file, reviewed the documents, made more than a cursory, but less than a total review of the affidavits, the documents that have been withheld and the exemptions claimed for them, and I am satisfied that the exemptions are properly claimed,

Mr. Lesar, so I'm going to grant the government's motion and deny yours. If you can persuade the court of appeals to the contrary, more power to you.

MR. LESAR: I'll try.

THE COURT: All right. This case has been around since 1987. It would be nice—it's coming up on its tenth anniversary, in other words.

MR. LESAR: Yes.

THE COURT: It would be nice if there was some prospect that there were going to be further reviews, further release of documents, a little flexibility on the part of Mr. Summers, but I gather that there won't be, and so let's—let's just move it along.

MR. LESAR: All right.

MS. PUSTAY: Thank you, your honor.

MR. LESAR: Thank you, your honor. I assume that the court will be issuing a written order?

THE COURT: I'm not going to write an opinion, just a summary order, and then you can reiterate everything that you've said on the fifth floor.

MR. LESAR: All right, thank you.

THE COURT: Let them worry with it for a while.

MR. LESAR: All right.

The district court issued its "summary order" on the same day that the hearing took place. The order stated that "upon consideration of" the record, including the affidavits of three FBI agents and "the Court's own review of a sampling of the redacted documents and *Vaughn* indices, ... the materials withheld by defendant are, in fact, properly withheld under the Freedom of Information Act." The two-page order did not refer to any particular withheld document, nor did it refer to any of the specific FOIA exemptions raised by the government.

Three days after the district court issued its decision, the government notified the court that it is reversible error not to make "specific findings of segregability regarding each of the withheld documents." *See Krikorian v. Department of State,* 984 F.2d 461, 467 (D.C.Cir.1993). Attempting to correct this problem, the government submitted a proposed order stating that "all legal re-quirements for the exemptions invoked by defendant pursuant to the Freedom of Information Act ... have been satisfied, and that all reasonably segregable, nonexempt material has been disclosed." The proposed order further stated that it was "just and proper" to grant the government's summary judgment motion "for the reasons set forth in Defendant's Motion for Summary Judgment and supporting papers." The district judge signed the government's proposed order *verbatim,* without waiting for Summers to file a response.

Summers filed a timely notice of appeal from the district court's grant of summary judgment in favor of the government.

## II. Discussion

### A

■ Our analysis of this case focuses not on whether our review of the district court's decision discloses error, but rather on the nature of our review. As the government rightly points out, it is well-understood law that "[w]e review orders granting summary judgment *de novo." Gallant v. NLRB,* 26 F.3d 168, 171 (D.C.Cir.1994). This is so because in our review of decisions granting summary judgment we must decide the same question that was before the district court: "[t]hat is, we must determine whether there is on the record 'no genuine issue as to any material fact.'" *Id.* (quoting Fed.R.Civ.P. 56(c)). For that reason, we normally do not require the district court to make findings of fact or conclusions of law in support of orders granting summary judgment. Indeed, the Federal Rules specifically provide "findings of fact and conclusions of law are unnecessary on decisions of motions under Rule ... 56." Fed.R.Civ.P. 52(a).

Not only is it the general rule that we do not require findings of fact and conclusions of law in decisions allowing summary judgment, in the ordinary run of cases this rule is a most sensible one. As the granting of summary judgment depends in the first instance on the lack of issues of material fact, if the trial judge had to engage in the weighing of evidence and the finding of fact in order to reach a decision, then a grant of summary

judgment would not be in order. Further, as noted above, our task on appeal is the same as the task faced by the district court— reviewing the record *de novo* to determine whether genuine issues of material fact would preclude summary judgment. Thus, because our own review is coterminous with that of the district court, the findings and legal conclusions of a district court could be no more than useful and desirable in ordering our review.

However, due to the peculiar nature of the FOIA, we have created exceptions to the normal summary judgment review processes applicable to litigation under that statute. The FOIA, enacted in 1966, reflects "a general philosophy of full agency disclosure." *United States Dep't of Defense v. FLRA*, 510 U.S. 487, 494, 114 S.Ct. 1006, 1011–12, 127 L.Ed.2d 325 (1994) (citation omitted). In keeping with this goal, the Act requires every agency, "upon any request for records which ... reasonably describes such records," to make such records "promptly available to any person." 5 U.S.C. § 552(a)(3). Although "disclosure, not secrecy, is the dominant objective of [the FOIA]," *United States Dep't of Defense*, 510 U.S. at 494, 114 S.Ct. at 1012, the statute contains nine exemptions under which agencies may refuse to disclose requested information. 5 U.S.C. § 552(b). These exemptions stem from Congress's recognition that the release of certain information may harm legitimate governmental or private interests.

■ When an agency declines to produce a requested document, the agency bears the burden before the trial court of proving the applicability of claimed statutory exemptions. 5 U.S.C. § 552(a)(4)(B). To carry this burden, an agency must submit a "*Vaughn* index" to explain why it has withheld information. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973). The *Vaughn* index "must adequately describe each withheld document or deletion from a released document," and "must state the exemption claimed for each deletion or withheld document, and explain why the exemption is relevant." *Founding Church of Scientology v. Bell*, 603 F.2d 945, 949 (D.C.Cir.1979).

Under the FOIA, district courts reviewing agency decisions must "determine the matter de novo, and may examine the contents of

[requested] agency records in camera to determine whether such records or any part thereof shall be withheld under any of the [applicable] exemptions...." 5 U.S.C. § 552(a)(4)(B). If a district court determines that an agency has withheld information improperly, the court may order the agency to produce that information. *Id.* Each of the nine exemptions requires the withholding agency in the first instance and the reviewing court in the second to make distinct decisions as to factual questions. When the district court reviews an agency's *Vaughn* index to verify the validity of each claimed exemption, its determination resembles a fact-finding process. Such a review usually, if not always, comes in the context of cross-motions for summary judgment which we then review *de novo*, which means "in the FOIA context ... that we ascertain whether the agency has sustained its burden of demonstrating that the documents requested are not 'agency records' or are exempt from disclosure under the FOIA." *Gallant*, 26 F.3d at 171 (quoting *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n. 3, 109 S.Ct. 2841, 2847 n. 3, 106 L.Ed.2d 112 (1989)).

While the process of reviewing a *Vaughn* index and the accompanying documents for fact-specific questions may be an onerous one for a district court, it is at least triply so for an appellate court. We do not underestimate the task of the district judge in having to acquire access to reams of paper, make intensive review of that material, and reach document-specific conclusions. Nonetheless, for three judges to either simultaneously or seriatim acquire and peruse the same documents and then attempt a collegial decision is still more daunting. As the Ninth Circuit has put it, "[t]he appellate court is particularly ill-equipped to conduct its own investigation into the propriety of claims for nondisclosure." *Van Bourg, Allen, Weinberg & Roger v. NLRB*, 656 F.2d 1356, 1358 (9th Cir.1981) (citing *Vaughn, supra*).

In *Vaughn*, we recognized the burden placed upon the district court when the government fails to establish with sufficient specificity the basis of claimed exemption from FOIA disclosure of specific documents. To alleviate that burden, we established the

requirement for a *Vaughn* index so that a district judge could "examine and rule on each element of the itemized list." 484 F.2d at 827. In so doing, we further recognized that "[w]hen appealed, such an itemized ruling should be much more easily reviewed than would be the case if the government agency were permitted to make a generalized argument in favor of exemption." *Id.* When the government has submitted such an itemized list, but the district court has made only a generalized ruling, the burden upon the district court has been (at least potentially) alleviated but the triple burden on the appellate court has not.

▮ In recognition of the judicial efficiency to be gained by requiring the district court to review the *Vaughn* index with some specificity as we have required of the agency in its filing, we determined in 1975 that it constitutes an "abuse of discretion" for a district court "to deny a plaintiff's reasonable request for clarification of an adverse summary judgment order in an FOIA case." *Schwartz v. Internal Revenue Service*, 511 F.2d 1303, 1307–08 (D.C.Cir.1975). Furthermore, it is an abuse of discretion for the district court not to make "specific findings of segregability regarding each of the ... documents" withheld in response to a FOIA application, upon the plaintiff's reasonable request. *Krikorian*, 984 F.2d at 467. The concerns of efficiency that apply to the question of segregability *vel non* are relevant to all aspects of a summary judgment upholding an agency's claimed exemptions. We hold that the plaintiff's statement in the district court assuming "that the court [would] be issuing a written order" constituted a "reasonable request for clarification" under *Schwartz*. We must therefore remand this controversy as falling within the *Schwartz* exception to normal summary judgment review process.

Later decisions of this and other circuits have reaffirmed and clarified the *Schwartz* exception to Rule 52(a). *See Founding Church of Scientology*, 603 F.2d at 950 ("Dis-

trict Court decisions in FOIA cases must provide statements of law that are both accurate and sufficiently detailed to establish that the careful *de novo* review prescribed by Congress has in fact taken place."); *Coastal States Gas Corp. v. Department of Energy*, 644 F.2d 969, 980 (3d Cir.1981) (A district court's obligation to state the legal basis for its resolution of a FOIA summary judgment motion "is, in a sense, implicit in the statutory duty of *de novo* review.").

Most similar to the present case is *Truitt v. Department of State*, 897 F.2d 540 (D.C.Cir.1990). In *Truitt*, as in the present case, the agency from which the documents were requested invoked several FOIA exemptions—in that case five.[1] In *Truitt*, the district court found "that the exemptions claimed for the eight specific documents ... [were] appropriately invoked and justified by the detailed descriptions given of those documents." *Id.* at 547. We reversed, holding that the district court's generalized treatment "leaves us unable to engage in effective appellate review." *Id.* In the present case, where there are thousands of documents, the district court's generalized acceptance of the government's exemption claims leaves us with the same inability.[2]

### B

A brief review of the exemptions claimed and the nature of the Hoover files starkly illustrates the reasons the *Schwartz* rule is necessary for effective appellate review of complex FOIA cases. Our comments in this review are not intended to decide the questions which we raise, but only to highlight the problems which the district judge should resolve before this case is resumed at the trial level.

As we suggested above, the so-called "official and confidential" files were not kept in the FBI's central records system, nor were they accessible by FBI personnel-at-large in the regular course of their duties. All con-

1. In the present case the FBI invokes either four or six, depending upon how one views the subsections of exemption 7.

2. In fairness, there were more than eight documents in the *Truitt* case also, but eight apparent-

ly was the number of sample documents sought for *in camera* review. 897 F.2d at 547 n. 53. In the present case, 500 selected documents made up the *Vaughn* index.

cerned generally agree that Hoover maintained the files for his own purposes which many, including the appellant, allege to have included improper ones. For example, Summers and other writers assert that Hoover's system of secret files constituted an important means of exercising power in the political arena. *See generally* ATHAN THEOHARIS, FROM THE SECRET FILES OF J. EDGAR HOOVER (1991); and ANTHONY SUMMERS, OFFICIAL AND CONFIDENTIAL: THE SECRET LIFE OF J. EDGAR HOOVER (1993). Although the government may not have formally conceded the breadth of the allegations against the late Director, neither has it contended that Summers's characterization of the files and their reason for being is without basis in fact. It is against that background that the district court must measure the applicability of the asserted FOIA exemptions. As we noted above, the FBI withheld documents under several FOIA exemptions: specifically, exemptions 1, 2, 6, 7(C), 7(D), and 7(E). The district court did not address in its summary order which exemptions it found to be applicable, therefore we presume it approved them all. Likewise, in its supplemental order, entered after the appellee called to the attention of the court that a failure to specifically address segregability of nonexempt material was reversible error under *Krikorian,* the court only generally cited to 5 U.S.C. § 552. Therefore, we will highlight a few of the fact-related inquiries necessary to determine the applicability of each of the listed categories of exemption. We intend our discussion to illustrate, not exhaust, those matters that are better handled in the first instance by a court designed for the processing of fact than by a collegial court better equipped for review.

After establishing the general availability of agency records, the FOIA provides that "this section does not apply to matters that are" listed in subsections thereafter. 5 U.S.C. § 552(b). The FBI submissions claim exemption of some documents under subsection (b)(1), which exempts matters that are

(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order.

5 U.S.C. § 552(b)(1). To justify exemption under this subsection, the government must establish compliance with an appropriate Executive Order and proper classification pursuant to that Order. *See generally Baez v. United States Dep't of Justice,* 647 F.2d 1328, 1331–37 (D.C.Cir.1980). As to the documents before us, this analysis is complicated by an apparent change in the applicable Executive Order between the time of classification (apparently January or February of 1989 as to most of the documents) and the time of litigation. The newer order, Executive Order No. 12,958, differs considerably from its predecessor, Executive Order No. 12,356. Significantly, the newer order is less restrictive, reflecting what it refers to as "dramatic changes" in national security concerns in the late 1980's following the United States' victory in the Cold War.

We are not able to tell from the record which of these Executive Orders the district court construed in concluding that material withheld under the exemption met its criteria. While we accept the government's argument that "substantial weight" must be accorded agency affidavits "concerning the details of the classified status" of the records at issue, *Krikorian,* 984 F.2d at 464, we are ill-equipped to determine whether the district court properly concluded that those affidavits carried the day without an express determination of which order's criteria he used as his template. We offer this "two-orders" problem only as illustrative and not exhaustive of the decisions that the district court must make in order to determine the applicability of exemption 1, and that we expect all district courts to elucidate in cases of this complexity in order to provide a foundation for appellate review.

Exemption 2 arises from 5 U.S.C. § 552(b)(2), which exempts from disclosure documents that are "related solely to the internal personnel rules and practices of an agency." While the FBI made but little use of this exemption in its claims before the district court, and the parties do not address it on appeal, it does appear in the FBI's original claim. Because the district court did not sort out its acceptances and rejections, we would expect after remand to learn what,

if any, material is covered by that exemption and why such material is covered.

Exemption 6, 5 U.S.C. § 552(b)(6), permits withholding of material "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." This exemption and the exemptions under subsection 7 may most clearly demonstrate that a single-judge trial court is better suited to perform the FOIA analysis in the first instance than a multiple-judge appellate court. In order to uphold a claim under exemption 6, the reviewing court must balance the individual's right to privacy against the public's interest in disclosure. *See, e.g., Department of the Air Force v. Rose,* 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976). To make this decision, the court must determine, *inter alia,* the nature of the public's right to know and the extent of the privacy interest involved. A similar balancing approach extends to claims of exemption under subsections (7)(A) and (C). *United States Dep't of Justice v. Reporters Committee,* 489 U.S. 749, 776–80, 109 S.Ct. 1468, 1483–86, 103 L.Ed.2d 774 (1989). Significantly, for exemptions requiring such an analysis, the Supreme Court has observed that the public interest rationale of the FOIA "focuses on the citizens' right to be informed about 'what their government is up to.'" *Id.* at 773, 109 S.Ct. at 1481. As the appellant's FOIA request was designed to disclose misconduct at the highest levels of the FBI, he rightly expects a court to carefully assess that public interest in the balancing process. We expect on remand that the district court will provide a record of having done so.

On the other side of the balance, the privacy interests involved in Hoover's files, or at least some of them, may not be of the sort most esteemed by the statute. At oral argument, the government articulated a privacy interest purportedly involving the interest of individuals in not being known to have associated with Hoover in his intelligence-collection process. As the Supreme Court observed in *Reporters Committee,* "the privacy interest protected by Exemption 7(C) is in fact at its apex" when the information sought "is in the Government's control as a compilation, rather than as record of 'what the Government is up to.'" *Id.* at 780, 109 S.Ct. at 1485–86. That being the case, when, as here, the infor-

mation is not a compilation but rather a direct record of "what the government is up to," it would seem likely that any privacy interest is at its nadir. Be that as it may, all of these inquiries are fact-intensive, delicate, and far better suited in the first instance for the ruminations of a single trial judge, expert at finding facts, rather than for the deliberations of a three-judge committee far more adept at finding fault.

Finally, subsection 7 exempts from the FOIA

records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records ... (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, ... [or] (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions, if such disclosure could reasonably be expected to risk circumvention of the law....

5 U.S.C. § 552(b)(7). As we have already noted, our review of the district court's interest-balancing under exemptions 6 and 7(C) requires that it fully articulate the balance it reaches; in addition, all three sections of exemption 7 suggest additional fact-intensive tasks which the district court must perform if our review is to be both efficient and meaningful. At the very threshold of section 7 exemption, the government must show that the withheld material consists of "records or information compiled for law enforcement purposes." Usually that question might be readily determined without the creation of an extensive record. In this case, if the United States is to establish that files kept in the office of the director in Washington and not readily available to field agents constitute law enforcement records or information for FOIA purposes, then we would expect a clear demonstration of how it has met that burden.

Similarly, we would expect a showing as to records exempted under 7(D) of how the persons protected are "confidential sources" within the meaning of the statute. On remand, the district court should record why it concluded that the government met this burden.

Again, the matters discussed in this section of our opinion are offered as illustrative and not exhaustive of the type of problem ill-suited to explication in the first instance by an appellate court. Presumably, a first review by a district court would not only provide gains in efficiency of any ultimate review, but it might be expected to truncate or even eliminate such review. That is, when a district court adequately explains its ruling, the losing party might be convinced that the district court is correct, or at least has not fallen into *reversible* error, as to some or all of the matters in controversy, and therefore bring such matters to rest at a much earlier stage and at much less cost to the system.

### III.  Conclusion

For the foregoing reasons, we conclude that the record is not adequate for us to afford proper review to the summary judgment entered below. For that reason, we order that the judgment be vacated and this case remanded for further proceedings consistent with this opinion. In so doing, we note that this matter has lingered long in the court system and express the hope that it may be resolved before the passage of too much more time.

*So ordered.*

SILBERMAN, Circuit Judge, concurring:

I find myself in a rather strange situation in this case because, unlike the district judge, I *have* in a sense reviewed Hoover's official and confidential files "*in camera,*" but did so almost 25 years ago as the Deputy Attorney General (and Acting Attorney General) of the United States. The Washington Post caused an uproar when it revealed their existence in early 1975, and I was obliged to read them in preparation for testimony before the House Judiciary Committee. Strangely, although the Washington Post knew about the files (and may well have known about them for

some time) senior officials in the Justice Department did not. Even Clarence Kelley, then-Director of the FBI, never realized that the file cabinets in his outer office contained the long-rumored secret files of J. Edgar Hoover.[1]

As is now generally known, the files revealed that Hoover, through bureau agents, had collected over many years scandalous material on public figures to be used for political blackmail. They also contained shocking information as to how the FBI had been used by several Presidents, most notably Lyndon Johnson, as a political investigative unit to gather dirt on political opponents. The Bureau even sought to accommodate President Johnson by frustrating at least one criminal investigation that would prove politically embarrassing—and subsequently informing the White House as to the identity of Treasury officials who aided the investigation.

There can be no doubt that these documents as a group are of the very highest public interest. The public concern over presidential misuses of power has been amply demonstrated by the Act of Congress ensuring that "Watergate" material from the Nixon White House be preserved and disclosed. Indeed, these files may well cast some light on Watergate's genesis. I suspect that Richard Nixon, who was reputed to have threatened darkly during the Watergate investigation to expose the misdeeds of prior Presidents (and probably wished that the Post story had appeared a year earlier), was prompted to gather political intelligence through private actors because he wanted what Johnson had obtained, yet did not trust the FBI to provide it. Although the Bureau had the unmitigated gall to claim in an affidavit before the district court that the files "are of minimal public interest," counsel for the government at least conceded at oral argument that the public interest in the documents was high.

Turning to the other side of the equation, targets of the FBI's dirt-gathering activities may have an overwhelming privacy interest. The FBI, however, has made no reasonable effort to determine whether these targets are

---

1.  That is not to say that I am confident that all of   Hoover's files were in those cabinets.

now dead or alive. If they are deceased, their privacy interest is almost certainly diminished. And even for those who are alive, the privacy interest may vary. Those who were investigated to determine their political connections to Robert Kennedy—whether President Johnson's White House staffers or certain newspaper owners—might be rather proud to have been targeted. Those who provided information to Hoover, inside and outside government, which was not for law enforcement purposes, are not, in my view, at all entitled to privacy. The government seems to have taken the position in this case that anyone, including those in the news media, who gave Hoover or the FBI information about potential political enemies is entitled to protection from exposure. I think that is absurd; that the statute explicitly protects law enforcement confidential sources implies that non-law enforcement sources—here, confidential sources of political information ("Hoover Friendlies")—are not protected. To be sure, some of the material in the files may have been collected originally for law enforcement purposes and therefore should be treated as such, but having read the files I can confidently state that they were *not*, repeat *not*, compiled for enforcement. The government should not be allowed to claim the law enforcement privilege merely by asserting that a file or document contains descriptions of conduct that would be a crime under some law, somewhere.

We are remanding to the district court and urging it to proceed with alacrity. I know how busy our district judges are and how formidable a pile of material this case presents, but I urge Judge Jackson to read *in camera* as much of these files as he can so that he will fully understand the enormous public interest in these materials. Given their importance, I would hope senior officials in the Justice Department, rather than just an Assistant United States Attorney, would also review the files. That could expedite proceedings.

STEPHEN F. WILLIAMS, Circuit Judge, concurring:

I concur but wish to add that one of the obstacles to granting the government's motion for summary judgment may be that its affidavits are obscure about how much effort it makes to find out if the persons whose privacy it invokes are alive or dead. The affidavit of Special Agent Llewellyn says that the Bureau did not invoke either of the privacy exemptions (6 or 7(C)) if "the FBI had knowledge from the responsive files or independently that a person is deceased." That of Special Agent Superneau similarly says that she did not withhold information relating exclusively to "individuals that I know to be deceased." It would seem to be consistent with these affidavits that the agents have been completely passive on the issue, taking death into account only if the fact has happened to swim into their line of vision. If that is true, there would be a question whether the Bureau's invocation of the privacy interest represented a reasonable response to the FOIA request, at least if the Bureau has, or has ready access to, data bases that could resolve the issue.

