**Un Suk COLDIRON, Plaintiff,**

**v.**

**UNITED STATES DEPARTMENT OF JUSTICE, Defendant.**

**No. CIV.A.02–0927 (HHK).**

United States District Court, District of Columbia.

March 2, 2004.

Joel P. Bennett, The Law Office of Joel P. Bennett, Washington, DC, for Plaintiff.

Peter Blumberg, United States Attorney's Office, Civil Division, Washington, DC, for Defendant.

## MEMORANDUM OPINION

KENNEDY, District Judge.

Plaintiff, Un Suk Coldiron ("Coldiron"), brings this action against defendant, United States Department of Justice ("DOJ"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Plaintiff seeks access to various records from the Federal Bureau of Investigation ("FBI") related to her loss of security clearance in her employment with the former Immigration and Naturalization Service ("INS"), now a bureau in the Department of Homeland Security. In response, defendant seeks to withhold and redact certain documents by invoking certain privileges under FOIA Exemptions 1, 6 and 7. 5 U.S.C. § 552(b)(1), (6) & (7)(c).

Before this court is defendant's motion for summary judgment [Dkt. # 11]. Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that defendant's motion for summary judgment must be granted.

## I. BACKGROUND

### A. FOIA Background

■ Congress enacted FOIA "to open up the workings of government to public scrutiny through the disclosure of government records." *Stern v. FBI*, 737 F.2d 84, 88 (D.C.Cir.1984) (internal quotation marks omitted). FOIA was intended to " 'ensure an informed citizenry, vital to the functioning of a democratic society.' " *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C.Cir.1992) (quoting *FBI v. Abramson*, 456 U.S. 615, 621, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982)). In so doing, however, Congress acknowledged that "legitimate governmental and private interests could be harmed by release of certain types of information." *Id.* In order to balance these competing interests, FOIA contains nine exemptions under which an agency may withhold information. 5 U.S.C. § 552(a)(4)(B) & (b)(1)-(9). Because FOIA creates a policy favoring disclosure, however, the Act's exemptions are to be narrowly construed. *Dep't of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). Therefore, an agency must "disclos[e] as much information as possible without thwarting the exemption's purpose." *King v. Dep't of Justice*, 830 F.2d 210, 224 (D.C.Cir.1987).

■ When an agency refuses to disclose certain documents pursuant to a FOIA exemption, it must ordinarily produce a "*Vaughn* Index," a description of each document withheld or redacted and an explanation of the reasons for non-disclosure. *See Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C.Cir.1973) (creating a "system of itemizing and indexing" that requires agencies invoking FOIA exemptions to "correlate statements made in the ... refusal justification with the actual portions of the document"). The index must permit a court to engage in a meaningful review of the agency's decision. *See Oglesby v. Dep't of Army*, 79 F.3d 1172, 1176 (D.C.Cir.1996).

■ In addition to distinguishing exempt from non-exempt documents, an agency must perform a "segregability

analysis": It must also distinguish exempt from non-exempt material *within* each document. *See Vaughn,* 484 F.2d at 825 ("[A]n entire document is not exempt merely because an isolated portion need not be disclosed. Thus the agency may not sweep a document under a general allegation of exemption, even if that general allegation is correct with regard to part of the information."). An agency must therefore redact exempt information and produce any relevant non-exempt information. *See* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."). If an agency can show that certain material in a document is exempt but cannot be reasonably segregated from non-exempt information, that agency must also "describe what proportion of the information is non-exempt and how that material is disbursed throughout the document," such that "both litigants and judges will be better positions to test the validity of the agency's claim that the non-exempt material is not segregable." *Mead Data Cent., Inc. v. Dep't of Air Force,* 566 F.2d 242, 261 (D.C.Cir. 1977).

## B. Factual Background

Coldiron is and, at all relevant times, was an employee of the INS. She alleges that some time in September 1998, the FBI compiled a report on her and subsequently gave it to the INS. In January 2000, the INS informed Coldiron that, based on the information in the report, it would suspend her security clearance and give her 30 days to contest the suspension, after which her security clearance would be permanently revoked. In March 2000, Coldiron requested access to the very records which the INS used to find her ineligible for security clearance. The INS forwarded fifteen pages of documents to the FBI for processing under FOIA and Executive Order 12,968, as well as asking the FBI to respond directly to Coldiron. *See* Def.'s Ex. A (Wood Ltr. to O'Brien, May 22, 2000). In May 2000, the FBI released six of 15 pages to Coldiron, and to justify its withholdings and redactions invoked FOIA Exceptions 1 and 7(c) as well as the Privacy Act, § 5 U.S.C. 552a(j)(2) and (k)(1). *Id.*

In January 2001, Coldiron wrote to the FBI to request, pursuant to FOIA and the Privacy Act, access to all documents involving her it possessed. *See* Def.'s Ex. D (Ross Ltr. to Colton, Jan. 30, 2001). In addition to the 15 pages from the INS, the FBI located 56 pages on Coldiron from its records, all from a FBI personnel file that included her application for the position of FBI Special Agent. In March 2001, the FBI released 62 of 71 pages to Coldiron. From the 56 pages of FBI's file, Coldiron received 53 pages in their entirety and three pages with redactions, pursuant to FOIA Exemptions 6 and 7(c) only. *See* Kiefer Decl. ¶ 12. Of the 15 pages referred by the INS to the FBI, six pages were released to Coldiron and nine were withheld. Coldiron timely appealed the FBI's withholding decisions to DOJ's Office of Information and Privacy ("OIP"). In December 2001, OIP informed Coldiron by letter that it had upheld the FBI's actions. *See* Def.'s Ex. I at 1 (Huff Ltr. to Rose, Dec. 27, 2001). OIP informed Coldiron that it would refer the withheld documents to DOJ's Department Review Committee ("DRC") to determine if certain materials could be declassified. *Id.* at 2.

Coldiron filed the present action on May 13, 2002, alleging that the FBI had violated FOIA and the Privacy Act in withholding certain documents. Compl. ¶¶ 11–19. Coldiron's complaint requested that this court "enjoin the Defendants from withholding agency records and to order the

production of any agency records improperly withheld from the Plaintiff." *Id.* at 4. This prayer for relief is less than clear about the exact information Coldiron seeks. But elsewhere, Coldiron makes clear that she wants access to the "information regarding herself," *id.* ¶ 14, which the INS used to suspend her security clearance. Finally, in September 2002, the FBI informed plaintiff that DRC had completed its classification review and provided seven more pages of redacted documents. *See* Kiefer Decl. ¶ 5(k).

## II. ANALYSIS

### A. Legal Standard

Under Fed.R.Civ.P. 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In FOIA cases, agency decisions to withhold or disclose information under FOIA are reviewed *de novo* by this court. *Mead Data Cent.,* 566 F.2d at 251 (finding that the district court "decides a claim of exemption de novo"). FOIA places "the

burden ... on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B). In other words, an agency bears the burden of justifying, in accord with a FOIA exemption, its refusal to disclose materials. *Campbell v. U.S. Dep't of Justice,* 164 F.3d 20, 30 (D.C.Cir.1998); *Abbotts v. NRC,* 766 F.2d 604, 606 (D.C.Cir.1985). An agency may meet this burden by submitting a *Vaughn* Index that describes the withheld material in reasonable detail and explains why it falls within the claimed FOIA exemptions. *Summers v. Dep't of Justice,* 140 F.3d 1077, 1080 (D.C.Cir.1998). The court should grant a FOIA requester's motion for summary judgment "[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption ...." *Petroleum Info. Corp. v. Dep't of Interior,* 976 F.2d 1429, 1433 (D.C.Cir.1992). Conversely, the agency affidavits "cannot support summary judgment if they are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *King,* 830 F.2d at 219 (internal quotation marks omitted).

### B. Exemption 1 Analysis

Coldiron does not seriously contest the sufficiency of the FBI's search for documents pursuant to her FOIA request.[1] Nor does she appear to meaningfully challenge the FBI's redactions pursuant to Exemptions 6 and 7.[2] Instead, plaintiff con-

---

1. "For purposes of this Motion, we are satisfied that their search has been adequate to retrieve the requested documents." *See* Pl.'s Opp'n at 4. Coldiron attempts to reserve the right to contest the sufficiency of the FBI's search: "To the extent that these documents [that might explain why the INS suspended Coldiron's security clearance] have not been discovered through their search, Ms [sic] Coldiron contends that the search may have been inadequate." *See id.* However, the FBI need only demonstrate that its search was reasonable, not that it retrieved all responsive docu-

ments. *See Nation Magazine v. U.S. Customs Serv.,* 71 F.3d 885, 892 n. 7 (D.C.Cir.1995); *Miller v. U.S. Dep't of State,* 779 F.2d 1378, 1383 (8th Cir.1985). According to this standard, FBI's search was adequate. *See* Kiefer Decl. at 5–10 (describing in detail the Central Record System used to find any FBI records on Coldiron).

2. Coldiron purports to challenge the sufficiency of the Kiefer Declaration with regard to each claimed FOIA exemption. *See* Pl.'s Opp'n at 5 ("Simply stated, the defendants

tests the adequacy of the Kiefer Declaration in supporting FBI's redactions and withholdings under Exemption 1. Pl.'s Opp'n at 5 (arguing that the affidavit is "wholly inadequate" to support FBI's summary judgment motion).

■ Exemption 1 allows federal agencies to withhold or redact materials that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). That is, to justify redactions or withholdings for national security reasons, an agency must establish that it has both complied with an appropriate Executive Order and properly classified materials pursuant to that order. *See Summers*, 140 F.3d at 1082 (citing *Baez v. U.S. Dep't of Justice*, 647 F.2d 1328, 1331–37 (D.C.Cir.1980)). In cases involving national security exceptions, such as 5 U.S.C. § 552(b)(1), declarations issued by agency officials merit "substantial weight." *Campbell*, 164 F.3d at 30 (citing *King*, 830 F.2d at 217). However, such deference "is not equivalent to acquiescence," and even declarations in-

voking national security must provide a basis for the FOIA requester to contest, and the court to decide, the validity of the withholding. *Id.* (citing *King*, 830 F.2d. at 218).

The Kiefer Declaration establishes the process the FBI followed in classifying as "secret" the INS materials withheld from Coldiron. The FBI explained that it followed the substantive, procedural and administrative requirements of E.O. 12,958, the Executive order that has, since 1995, governed the classification and protection of information affecting national security. *See* Kiefer Decl. ¶¶ 21–23. The FBI determined that the INS documents contained "information that continues to warrant the classification of Secret,'" Kiefer Decl. ¶ 24, under the classification categories established under E.O 12,958, specifically Section 1.5(c) ("intelligence activities (including special activities), intelligence sources or methods, or cryptology") and Section 1.5(d) ("foreign relations or foreign activities of the United States, including confidential sources").

In analyzing all Exemption 1 redactions, the FBI identifies three documents as DOC 1, DOC 2, and DOC 3.[3] DOC 1 is a

---

have failed to provide this Court with the necessary details of their claimed *exemptions.*") (emphasis added). However, after making this general statement, Coldiron cites only passages from the declaration involving Exemption 1. *Compare id.* at 5 (citing Kiefer Decl. ¶¶ 26–39) (analyzing exempt materials under Exemption 1); *id.* at 7 nn. 5–6 (citing Kiefer Decl. ¶¶ 26–39) (same) *with* Kiefer Decl.¶¶ 47–53 (analyzing exempt materials under Exemptions 6 and 7). Further, Coldiron cites cases only to the extent that they deal with Exemption 1. *See* Pl.'s Opp'n at 6–8. Plaintiff does not specifically deny the adequacy of the Kiefer Declaration in justifying redactions made under Exemptions 6 or 7. Absent any challenges from Coldiron, it appears that FBI has presented properly detailed justifications on these redactions. *See* Kiefer Decl.¶¶ 47–53. Therefore, the court

grants summary judgment in favor of the FBI on these redactions.

**3.** There is some confusion regarding the number of pages disclosed. The FBI claims to have withheld six documents in their entirety. *See* Kiefer Decl. ¶ 14. However, DOC 1, DOC 2 and DOC 3 constitute 10 pages. *See* Kiefer Decl. ¶¶ 25, 34, 38. The six so-called "withheld" pages seem to be amongst the 10 pages of DOC 1, DOC 2 and DOC 3. The redactions in DOC 1, for instance, are quite extensive, often covering what appears to be entire pages. *See* Kiefer Decl. ¶¶ 27–33. In any case, plaintiff does not argue that the FBI *completely* failed to describe the six withheld pages; rather, she contends that the FBI failed to describe these pages adequately. *See* Pl.'s Opp'n at 5–8.

seven-page letter from the Washington Field Office to FBI Headquarters, undated. Kiefer Decl. ¶ 25. DOC 2 is a two-page letter from Neil J. Gallagher, assistant director of the FBI's National Security Division, to the Director of the INS, dated August 30, 1999. *Id.* ¶ 34. DOC 3 is a one-page letter, from Gallagher to the INS Director, dated September 13, 1999. *Id.* ¶ 38. The documents relate to an INS/FBI investigation of Coldiron, for which the FBI claims authorization under 18 U.S.C. § 641 and E.O 12,958. *Id.* ¶ 13.

The FBI claims that the withheld portions of DOC 1, DOC 2, and DOC 3 "contain[ ] detailed information provided by the intelligence activity or method directed at a target of national security interest during a specific time frame and, if disclosed, would identify the activity or method." Kiefer Decl. ¶ 26. The FBI also provides two other pieces of general information. Not only would the redacted passages, if disclosed, reveal the FBI's means of gathering intelligence, but also the very "criteria utilized by the FBI in these instances to decide what actions by an individual or organization warranted the commencement of an investigation, or caused a certain activity to be given investigation attention over others." *Id.* ¶ 27. Further, the redacted portions would reveal the cooperation of foreign governments in the investigation of Coldiron, which "have not been publicly revealed." *Id.* ¶ 43. Unfortunately, this is exactly the information Coldiron has requested-documents that explain why the INS investigated and suspended her. The opportunity to "correct[ ] any inaccuracies relied upon by INS," Compl. ¶ 27, in such passages would let Coldiron challenge her suspension.

The Kiefer Declaration gloomily predicts the harm likely to result from providing currently withheld information to Coldiron and, therefore, the public:

It is my determination that the disclosure of this classified information could reasonably be expected to cause serious damage to the national security, as it would: (1) reveal the actual intelligence activity or method utilized by the FBI against a specific target; (2) disclose the intelligence gathering capabilities of the activity or method; (3) provide an assessment of the intelligence source penetration of a specific target during a specific period of time; and (4) reveal information that could adversely affect foreign relations of the United States. The release of this information could permit hostile governments to appraise the scope, focus, location, target and capabilities of the FBI's intelligence gathering methods and activities, and allow hostile agents to devise countermeasures to circumvent these intelligence activities or methods and render them useless in providing intelligence information. This would severely disrupt the FBI's intelligence gathering capabilities. This information is properly classified at the "secret" level and withheld pursuant to E.O. 12,958, Section 1.5(c) and (d).

*See* Kiefer Decl. ¶ 27.

A FOIA plaintiff may contest the adequacy of an agency withholding under Exemption 1 on several grounds. She may challenge the validity of a document's classification as secret under the appropriate Executive order. *See Campbell*, 164 F.3d at 29 (determining that whether an agency applied the correct Executive order, to determine whether information implicated national security, is a "threshold issue"). A FOIA requester may also challenge an agency's declaration as insufficient for lack of detail/specificity, bad faith, or failure to account for contrary record evidence. *See id.* at 30; *King*, 830 F.2d at 218.

Coldiron does not raise the issues of bad faith or contrary evidence. Neither does

Coldiron challenge the sufficiency of the FBI's *Vaughn* index[4] or segregability analysis.[5] Rather, she simply contends that the declaration lacks enough detail to support summary judgment. *See* Pl.'s Opp'n at 5 ("[T]he defendants have failed to provide this Court with the necessary details . . . ."); *id.* at 8 ("[I]f this court were to accept the defendant's minuscule level of detail in the Kiefer Declaration, then virtually every document relating to an FBI investigation could be exempted.").

Coldiron characterizes as a "conclusory mantra" the FBI's descriptions of DOC 1, DOC 2 and DOC 3—with regard to both the information withheld and the harm likely to result from its release. Pl.'s Opp'n at 5. She alleges that these same passages are repeated verbatim or referred to throughout the Kiefer Declaration, and that the FBI has merely applied a simple " 'cut and paste' formula." *Id.* The Kiefer declaration repeats the same passage in identifying withheld information as that contained in paragraph 26. *Compare* Kiefer Decl. ¶ 26 *with id.* ¶¶ 28–32, 37 (using the exact wording of ¶ 26); ¶¶ 33, 35 (paraphrasing slightly ¶ 26).[6] The lengthy passage explaining the predicted harm likely to result from releasing the withheld information, *id.* ¶ 26, is either repeated verbatim elsewhere in the document, *see id.* ¶¶ 36, 39, or is simply incorporated by reference. *Id.* ¶¶ 28–33, 37.

The FBI essentially concedes that its declaration is repetitive but explains that

4. In any case, the FBI's *Vaughn* index is at least *procedurally* adequate. That is, an agency's *Vaughn* index must "describe each document or portion thereof withheld, and for each withholding it must discuss the consequences of disclosing the sought-after information." *King*, 830 F.2d at 223–24. The Kiefer Declaration, in accord with the standards in *King*, identifies every redaction on each page of each document. Kiefer Decl. ¶¶ 25–39; *see, e.g., id.* ¶ 26 (identifying particular redactions within Page 1 of DOC 1, including "paragraphs 1, 2 and 3 in their entirety and the bracketed portions of lines 1–9 of paragraph 4").

5. In *Summers,* the D.C. Circuit found it an abuse of discretion for a court not to make specific segregability findings upon reasonable request by plaintiff. 140 F.3d at 1081 (citing *Krikorian v. Dep't of State,* 984 F.2d 461, 467 (D.C.Cir.1993)). Coldiron does not directly raise segregability as an issue. She seems to hint at segregability in her brief opposing FBI's summary judgment motion. *See* Pl.'s Opp'n at 8 ("[P]laintiff merely wants data concerning the allegation raised by her employer that derogatory information exists. While she needs to know what that derogatory information is, she does not need to know how it was obtained or by whom."). To the extent Coldiron argues segregability, the court finds the FBI segregability analysis adequate. First, segregability is usually an issue when an agency withholds an entire document without explaining why it cannot simply redact and disclose. *See Vaughn,* 484 F.2d at 825. It is not clear what sort of segregability analysis an agency is to provide on documents it has redacted and released. In this case, the FBI has identified each redaction on each page of the relevant documents. Secondly, the documents redacted under Exemption 1 have been reviewed several times and, after each review, the FBI disclosed additional redacted materials. *Compare* Def.'s Ex. B (indicating that Coldiron originally received six of 15 pages) with Kiefer Decl. ¶ (14) (indicating that after review, the FBI provided nine of 15 pages). Under similar circumstances, a sister court has validated an agency's attempts to segregate exempt from non-exempt materials. *See Public Citizen v. Dep't of State,* 100 F.Supp.2d 10, 25 (D.D.C.2000) *rev'd on other grounds, Public Citizen,* 276 F.3d at 644–45 ("the fact that the State Department, of its own accord, re-reviewed its withholdings and released certain additional entries indicates that the agency has been mindful of its obligation to release any segregable information.")

6. The only withheld information that seems to be different is the redacted portion of DOC 3: "The classified information withheld identifies the target of an FBI foreign counterintelligence investigation and contains detailed information about the specific target." Kiefer Decl. ¶ 38.

"much of the classified information withheld in these documents is the same or similar information." *Id.* ¶ 45. Furthermore, the FBI declaration indicates that each description "is not boilerplate, but has been specifically tailored for each redaction," *id.*, and that "each individual piece of information was evaluated with careful consideration." *Id.* ¶ 46. To the extent that each redacted passage concerns the same, classified subject, one would logically expect repetition. The D.C. Circuit allows repetition in such cases. *See King,* 830 F.2d at 224 ("When ... factors are identical for several documents withheld or items redacted, a single representation, accompanied by identifying references to the documents or portions at issue, may suffice.").

Therefore, the mere fact of repetition is not, in itself, important. Rarely does the court expect to find in briefs, much less *Vaughn* indices, anything resembling poet-ry. More importantly, controlling authority seems to indicate that declarations like the FBI's are sufficiently detailed. The D.C. Circuit has allowed an agency to withhold information under Exemption 1 based on passages similar to those in the Kiefer Declaration, paragraph 27, in at least three cases: *Public Citizen,*[7] *Schrecker v. Dep't of Justice,* 254 F.3d 162 (D.C.Cir.2001),[8] and *Halperin.*[9] The FBI encourages the court to compare the relevant passages in three cases with the Kiefer Declaration and conclude that the latter "provides exactly the type of detail that has been deem[ed] sufficient by this Circuit ...." Def.'s Mot. for Summ J. at 7.

It is somewhat troubling that these passages, purporting to explain harm to national security, are all quite similar. This is, to some extent, understandable. Classified documents, by definition, tend to be related in that their disclosure would cause particular kinds of damage to national se-

---

**7.** In *Public Citizen,* the State Department predicted the following harm from disclosing information:

> Withheld information relates directly to intelligence activities, sources or methods, discussed in the Document Description shown below. Disclosure of this information could enable foreign governments or foreign persons or entities opposed to United States foreign policy objectives to identify U.S. intelligence activities, sources or methods and to undertake countermeasures that could frustrate the ability of the U.S. Government to acquire information necessary to the formulation and implementation of U.S. foreign policy. Disclosure of this information, therefore, reasonably could be expected to result in damage to the national security.

276 F.3d at 644 (internal editing marks and citations omitted).

**8.** In *Schrecker,* the DOJ's *Vaughn* index indicated that the disclosure of withheld information

> should be expected to reveal the identity of a confidential human source or reveal the

> identify of a human intelligence source when the unauthorized disclosure of that source would clearly and demonstrably damage the national security interests of the United States by harming the FBI's ability to continuously recruit sources for current and future use.

254 F.3d at 166 (internal editing marks omitted). The D.C. Circuit accepted non-disclosure under Exemption 1 based on this language despite finding it "not entirely free of ambiguity." *Id.*

**9.** *Halperin* cited a deposition which predicted that to reveal withheld information-the names of the CIA attorneys-would "tend to reveal details of [intelligence] activities" and that "representatives of hostile, foreign intelligence services working in this country who, by a variety of techniques, can undertake courses of action to ascertain what other contacts, what other locations, and then arrive at determinations whether [the CIA's attorneys are] doing any other function for the Central Intelligence Agency." 629 F.2d at 149. *Public Citizen* itself cites, approvingly, this exact passage. *See* 276 F.3d at 644 (citing *Halperin,* 629 F.2d at 149).

curity. In *Public Citizen, Schrecker, Halperin,* and the present action, agency declarations invoked Exemption 1 and indicated that disclosure of withheld information would, in essence, tend to reveal the intelligence-gathering ability and sources of the United States and, therefore, undermine intelligence collection. *Id.*

It seems, however, that to woodenly follow *Public Citizen, Schrecker* and *Halperin* would be to encourage analysis by boilerplate or "cut-and-paste."[10] The temptation to simply cut-and-paste the same, albeit detailed, passage for every Exemption 1 claim must be great when the D.C. Circuit has repeatedly endorsed that passage through rulings favorable to agencies. **Even greater must be the temptation to use such boilerplate language when agency declarations invoking national security already must be accorded "substantial weight."** *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,* 331 F.3d 918, 927 (D.C.Cir.2003) (citing *McGehee v. Casey,* 718 F.2d 1137, 1148 (D.C.Cir.1983)) ("Courts are to accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record . . . .") (internal editing marks omitted); *see also id.* at 927 ("[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review.").

 This poses something of a dilemma. On the one hand, the D.C. Circuit has approved of certain language in Exemption 1 cases, and a court must to defer to agency claims of harm to national security. On the other hand, even in Exemption 1 situations, the court is not to be a wet blanket. No matter how much a court defers to an agency, its "review is not 'vacuous.'" *Ctr. for Nat'l Sec. Studies,* 331 F.3d at 940 (Tatel, J., dissenting); *see also Campbell,* 164 F.3d at 30 ("[D]eference is not equivalent to acquiescence . . . ."). An agency cannot meet its burden of justifying non-disclosure simply by invoking the phrase "national security." *Ctr. for Nat'l Sec. Studies,* 331 F.3d at 939 (Tatel, J., dissenting). It might be just as vacuous-and just as much an abdication of the court's de novo review duty-to allow the FBI to prevail time and time again on the same, 50 word[11] boilerplate language instead of just two words ("national security"), regardless of the content of the withheld information.

 In this situation, the court's scope of review is somewhat narrow. First, the court must require an agency invoking Exemption 1 to show that it "tailored its response to a specific set of documents." *Campbell,* 164 F.3d at 30–31. That is, an agency must demonstrate a logical connection between the "documents at issue and the general standards that govern the national security exemption." *Id.* at 31; *see also Ctr. for Nat'l Sec. Studies,* 331 F.3d at 939 ("[R]equiring agencies to make the detailed showing FOIA requires is not second-guessing their judgment about mat-

---

**10.** This fear, as plaintiff demonstrates, is not entirely unfounded, even in this case. Plaintiff points out that the FBI's motion for summary judgment is, to some extent, a "cut-and-paste" document. The motion refers twice to the Customs Service as the defendant instead of the FBI or the INS, Pl.'s Opp'n at 6 n. 4 (citing Def.'s Mot. for Summ. J. at 5, 25), and cites the Kiefer Declaration verbatim and at length. *Id.* (citing Def.'s Mot. for Summ. J. at 13–18).

**11.** For instance, "Withheld information relates directly to intelligence activities, sources or methods [disclosure of which] could enable foreign governments or foreign persons or entities opposed to United States foreign policy objectives to identify U.S. intelligence activities, sources or methods and to undertake countermeasures . . . ." *Public Citizen,* 276 F.3d at 644.

ters within their expertise.") (Tatel, J., dissenting). An agency need not fully explain its refusal to disclose, if such explanation would frustrate national security concerns, but it must provide enough detail to suggest that it has not simply engaged in "cut-and-paste." Once an agency demonstrates that it has tailored its response to the documents requested by a FOIA plaintiff, the court should not second-guess an agency's "facially reasonable concerns" regarding the harm disclosure may cause to national security. *Frugone v. CIA*, 169 F.3d 772, 775 (D.C.Cir.1999) ("Mindful that courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns.") (citing passage in *Military Audit Project v. Casey*, 656 F.2d 724, 745 (D.C.Cir.1981), requiring courts to accord substantial weight to agency claims regarding national security).

 In this case, the FBI's declaration provides enough detail to allow the court to find that it has properly invoked Exemption 1. The FBI identifies three documents, and identifies redactions made on each page of each document. Its identification of the withheld information on each page of each document is generic. Kiefer Decl. ¶ 26 ("The information withheld contains detailed information provided by the intelligence activity or method directed at a target of national security interest during a specific time frame and, if disclosed, would identify the activity or method."). However, the FBI provides several pieces of information that make its declaration, and predictions of likely harm to national security, seem tailored to DOC 1, DOC 2, DOC 3. First, the FBI indicates that the disclosure of redacted passages would make available contain the very "criteria utilized by the FBI in these instances to decide what actions by an individual or

organization warranted the commencement of an investigation, or caused a certain activity to be given investigation attention over others." Kiefer Decl. ¶ 43. Second, if these passages were released, they would reveal the cooperation of foreign governments in the investigation of Coldiron, not yet publicly revealed. *Id.* ¶ 43. These two details tend to distinguish these documents from other documents protected under Exemption 1. It is not just that "intelligence activities" are implicated, but that the FBI manages to provide another level of detail about precisely what methods (selection of targets for investigation) or kinds of sources (other countries) the redacted passages would compromise. Finally, while the FBI's declaration is repetitive, it is not mindlessly so. The FBI identifies the passages redacted from DOC 1 and DOC 2 as pertaining to current FBI intelligence-gathering activities or methods. Passages deleted from DOC 3, by contrast, contain specific details about the target an FBI foreign counterintelligence target. *Id.* ¶ 38. That the FBI identifies DOC 3 as different from DOC 1 and DOC 2 suggests that the FBI's declaration, though otherwise repetitive, is specifically tailored to the content of specific redactions in each document.

These details allow the FBI to demonstrate that the Kiefer declaration, and therefore application of Exemption 1, was tailored to the withheld information in its documents. Therefore, the court must grant the FBI's summary judgment motion.

## CONCLUSION

The words "Kafka-esque nightmare" may well describe Coldiron's ongoing employment relationship with the INS. It is undisputed that the INS suspended her security clearance, demanded that she explain herself, and invoked (through the

FBI) FOIA Exemption 1 to bar access to the very information upon which INS based its decision to suspend Coldiron. But because it appears that the FBI's invocation of Exemption 1 is proper, Coldiron may not access portions of the documents which would allow her to defend herself against the INS's claims. An appropriate order accompanies this memorandum.

### ORDER

For the reasons stated in the court's memorandum opinion docketed this same day, it is this 2nd day of March 2004, hereby

**ORDERED** that Judgment motion is entered in favor of defendant.